IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Sam Bonds, ) | |
| ) | Civil Action No. 6:07-1135-JFA-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits on October 31, 2000 (protectively filed October 17, 2000), alleging that he became unable to work on June 27, 2000. The application was denied initially and on reconsideration by the Social Security Administration. On August 22, 2001, the plaintiff requested a hearing, which was held on November 29, 2001. The plaintiff was present and represented by counsel at the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

hearing. On January 22, 2002, the administrative law judge (ALJ) before whom the plaintiff appeared, found the plaintiff was not under a disability. However, on September 9, 2002, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. A supplemental hearing was held on March 12, 2003, at which the plaintiff was present with counsel. At the hearing, the plaintiff amended his alleged onset disability date to September 27, 2001. On December 19, 2003, the ALJ before whom the plaintiff appeared found that he was not entitled to benefits. This finding became the final decision of the Commissioner when it was adopted by the Appeals Council on September 29, 2004, and no further action was taken on this claim.

On October 28, 2004, the plaintiff protectively filed the current application for a period of disability and disability insurance benefits. The application was denied initially and on reconsideration. On November 1, 2005, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff and his attorney appeared on September 7, 2006, considered the case *de novo*, and on October 31, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 30, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)  The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.
>
> (2)  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 20, 2003 through his last insured date of December 31, 2005 (20 CFR 404.1520(b) and 404.1571 *et seq*.).

(3)     Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease and a history of a gunshot wound to the righ tfoot (20 CFR 404.1520(c)).

(4)     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work.  The claimant is able to sit/stand/walk six hours each in an eight-hour workday.  He is able to occasionally lift 20 pounds and frequently lift ten pounds.  The claimant is limited to unskilled work secondary to mild to moderate concentration deficits from pain.

(6)     Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

(7)     The claimant was born on September 27, 1951 and was 54 years old on the date last insured, which is defined as an individual closely approaching advanced age (20 cFR 404.1563).

(8)     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not material to the determination fo disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled' (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)     Through the [date] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

(11)     The claimant was not under a "disability," as defined in the Social Security Act, at any time from December 20, 2003, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability

to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 52 years old as of his alleged onset date, and 54 years old on December 31, 2005, the date his insured status expired for disability insurance benefits (Tr. 41, 46, 117). He completed the eleventh grade and has past work experience as a heavy equipment operator (truck driver) (Tr. 80-81, 117-18).

The relevant period is this case is between December 20, 2003, the plaintiff's alleged onset of disability (Tr. 41), and December 31, 2005, the date his insured status expired for the purposes of disability insurance benefits (Tr. 46). The relevant evidence consists of medical evidence from four sources:  Scott E. Strohmeyer, M.D., a treating physician specializing in orthopaedics; Eugene A. Eline, Jr., D.O., an examining physician specializing in orthopaedics; treatment notes from unidentifiable sources at the Beaufort-Jasper-Hampton Comprehensive Health Services ("Comprehensive Health"); and Robert D. Kukla, M.D., a nonexamining State agency physician.

### *Dr. Strohmeyer*

Dr. Strohmeyer treated the plaintiff between March 2004 and November 2005 (Tr. 95-103). In March 2004, Dr. Strohmeyer ordered an MRI after the plaintiff continued to complain of back and right leg pain. The MRI was "pretty clean" with no signs of disk herniation or compression. Dr. Strohmeyer ordered an EMG, which confirmed S1 radiculopathy. He noted that the plaintiff's complaints, which had been going on for four years, were "not going to get better on [their] own." Dr. Strohmeyer recommended a diskogram before proceeding with any possible surgery (Tr. 101-03).

In July 2004, Dr. Strohmeyer stated, "[h]e is still trying to get on disability, which I told him I think he is going to have a tough time doing that." He estimated that the chance of improvement after fusion surgery was 7 out of 10 (Tr. 99).

In January 2005, the plaintiff declined a diskogram due to lack of funds. Later that month, Dr. Strohmeyer talked the plaintiff out of having surgery because he thought it would not help him "very much." He stated that the plaintiff would not be able to do heavy manual labor and referred the plaintiff to Social Services (Tr. 97-98).

In July 2005, Dr. Strohmeyer recommended that the plaintiff go to vocational rehabilitation. He also stated, "I encouraged him to get back and try to drive a truck. He has been doing it for 30 years. I think that he would be able to do that" (Tr. 96).

In November 2005, Dr. Strohmeyer recommended that the plaintiff continue with his current medications as "not much" had changed in the past two years (Tr. 95).

On March 2, 2006, Dr. Strohmeyer assessed the plaintiff's work abilities from December 2003 to the "present." Dr. Strohmeyer found that the plaintiff could perform sedentary work which allowed for alternating between sitting and standing. He found that the plaintiff had a significant limitation in his ability to concentrate, remain alert, think clearly or otherwise attend to work tasks to completion during an eight-hour workday due to pain or other discomfort. He found that the plaintiff's degree of limitation in concentration and attention to tasks would be less than 20% of the workday or workweek. Dr. Strohmeyer stated that the plaintiff would miss work from two to three days per month due to increased symptoms. Finally, he stated that the plaintiff could perform only part-time work due to pain, fatigue, and other subjective symptoms (Tr. 92-94).

***Dr. Eline***

On April 22, 2005, Dr. Eline saw the plaintiff for a consultative examination at the request of the Commissioner. The plaintiff complained of low back pain, rating it a 9 out

of 10, which radiated into his right leg. He reported being able to stand for 10 minutes, sit for 30 minutes, walk for 10-15 minutes, and lift five pounds. He complained of weakness, numbness and tingling in his right leg and foot. He indicated that he was taking ibuprofen, Darvocet, and Ben-Gay (Tr. 80). On examination, the plaintiff's mood and affect were normal; his pain level was mild to moderate; his gait was slightly antalgic without assistive devices; his coordination was normal; he had mild tenderness in his cervical spine; he had tenderness to palpation across his lumbar spine; his motor strength from L2-S1 showed some give away weakness throughout his lower extremities, but "basically appear[ed] to be intact"; his sensory exam was completely intact throughout his lower extremities; his straight leg raising was positive for back pain bilaterally, but with no tension signs or radicular symptoms; and his right foot had a severe hallux valgus deformity (Tr. 81). Dr. Eline diagnosed: (1) chronic lower back pain; (2) mild L5-S1 lumbar degenerative disc disease; (3) "[a]pparently noncompressive MRI scan of the lumbar spine per Dr. Strohmeyer's evaluation on 04/04"; (4) probable cervical spondylosis with cervical degenerative disc disease; and (5) right foot pain secondary to gunshot wound, MTP joint of right foot with resultant hallux valgus deformity. Dr. Eline provided the following opinion of the plaintiff's functioning:

> At this point, I state that [Plaintiff] is currently disabled as a result of his lower back condition and his right foot condition. It is my impression that he has been continuously disabled for over four years. He is not able to go back to work as a result of his lower back condition. He does have an EMG and according to Dr. Stromeyer's [sic] record, it shows a positive SI radiculopathy. He does have degenerative disc disease at L5-S1 levels and Dr. Stromeyer's [sic] counseled in regarding possible anterior lumbar interbody fusion. He does have an MRI scan. It does not [show] any compression. He is unable to stand for greater than 10 minutes, sit for greater than 30 minutes, walk for greater than 10 to 15 minutes, and lift greater than 5 pounds. He is unable to perform repetitive bending, squatting, twisting, lifting, or crawling activities. Other than the above-mentioned surgery, I do not feel there is any other assistive devices, braces or modifications that he could

>           demand. I do not feel based on education and vocational
>           background that he is a candidate for additional vocational
>           rehabilitation.

(Tr. 82).

### *Dr. Kukla*

On May 4, 2005, Dr. Kukla, a nonexamining State agency physician, reviewed the medical evidence and found that the plaintiff could perform light work.[2] Dr. Kukla found that the plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently. He found that the plaintiff could stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. He found the plaintiff could frequently push and/or pull (including operation of hand and/or foot controls) with his upper and lower extremities. He found that the plaintiff was limited in climbing and could occasionally balance, stoop, kneel, crouch, and crawl. Finally, he found that the plaintiff should avoid concentrated exposure to extreme cold and vibration and should avoid all exposure to unprotected heights (Tr. 83-90).

### *Comprehensive Health*

The plaintiff sought care, primarily for complaints of back pain, from Comprehensive Health between February 2005 and July 2006 (Tr. 71-79). In February 2005 and March 2006, the plaintiff had a completely normal physical examination (Tr. 76-77).

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls . . . ." 20 C.F.R. § 404.1567(b). The full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. *See* SSR 83-10, 1983 WL 31251, at *6 (1983).

On May 29, 2006, the plaintiff was seen in an emergency room for complaints of pain in his neck, back and leg following a minor motor vehicle accident. X-rays were unremarkable. The plaintiff was discharged with a diagnosis of "acute on chronic lumbar disc pain status post motor vehicle accident (Tr. 104-10).

On May 31, 2006, the plaintiff was seen for complaints of low back pain after being involved in a motor vehicle accident (Tr. 74). His straight leg raising was positive. In June 14, 2006, the plaintiff continued to complain of low back pain and his straight leg raising was positive. The examiner diagnosed low back pain and ordered an MRI (Tr. 73-74).

On June 16, 2006, an MRI of the plaintiff's back showed "some minimal disc bulging and early discogenic changes in the L5-S1 disc, but not definite neural impingement" (Tr. 79).

On July 27, 2006, the plaintiff's straight leg raising was positive (Tr. 71).

### *Hearing Testimony*

At the administrative hearing on September 7, 2006, the plaintiff testified that he was born on September 20, 1951, and completed the eleventh grade (Tr. 117). He testified that he last worked as a truck driver and janitor, and quit working on July 24, 2000 (Tr. 118). He collected worker's compensation and disability retirement. He stated he injured his lower back in a truck accident while working (Tr. 119). He testified that he had a sharp pain in his lower back which radiated into his right leg. He stated his pain had gotten worse since leaving work (Tr. 120). He also stated that a motor vehicle accident in June 2006 aggravated his back injury. He testified that the sharp pain in his back prevented him from working (Tr. 121). He testified that lying down, resting and medications made his back feel better (Tr. 212-22). The plaintiff testified that, in an eight-hour workday, he could stand and walk for two to three hours and sit for two to three hours. He testified

that he could lift up to 20 pounds. He testified that he was shot in his right foot in 1969 (Tr. 122). He stated that his right foot was more stiff since his accident in June 2006. He testified that his son did chores around the house. The plaintiff stated he did not do any yard work, dusting or vacuuming, but washed dishes once a week (Tr. 123). He testified that his wife and daughter usually washed the dishes and laundry (Tr. 123-24). He testified that he had a little pain in his back when he lifted a laundry basket full of clothes (Tr. 124). He mostly watched television, hung around the house and went to church about every week (Tr. 124). He testified that sitting too long aggravated his back (Tr. 125). He stated he could drive for an hour to an hour and a half before his leg became stiff (Tr. 125). He stated he had a hard time getting out of bed about two to three days per week due to pain in his lower back and leg (Tr. 125). He stated he preformed leg lifts in bed about once a week. He testified that he used "a stick" when he walked about two blocks (Tr. 126).

## **ANALYSIS**

The plaintiff alleges disability since September 27, 2001, due to a lower back injury and a pre-existing impairment of his right foot due to a gunshot wound. The ALJ determined that the plaintiff had severe impairments of lumbar degenerative disc disease and a history of gunshot wound to the right foot, but that he had the residual functional capacity to perform light work. The plaintiff alleges that the ALJ erred by (1) failing to properly consider the treating physician's opinion; (2) failing to properly assess the credibility of plaintiff's subjective complaints; and (3) relying on the Medical-Vocational Guidelines ("the Grids") instead of vocational expert testimony (pl. brief 11).

### *Treating Physician*

The plaintiff argues that the ALJ improperly rejected the opinion of Dr. Scott E. Strohmeyer, his treating orthopaedic surgeon. The opinion of a treating physician is entitled

11

to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

12

*Id.* 1996 WL 374188, *4.

The plaintiff was examined by Dr. Strohmeyer for complaints of back and leg pain in March 2004. Dr. Strohmeyer ordered a new MRI that showed degeneration of the L5-S1 disc, but no herniation or signs of compressive sequelae (Tr. 102). Dr. Strohmeyer ordered an EMG because he suspected that the plaintiff had a problem with the peroneal nerve below the fibular head which corresponded with the pain distribution in the right leg. In April 2004, Dr. Strohmeyer reviewed the EMG and confirmed that the plaintiff was experiencing radiculopathy at SI and possibly at L5 as well (Tr. 101). Dr. Strohmeyer indicated that the odds of improving the plaintiff's condition were not very good and recommended more conservative treatment, including the prescription of pain medication. Dr. Strohmeyer also advised the plaintiff that he would have a "tough time" getting approved for Social Security disability (Tr. 99).

In January 2005, Dr. Strohmeyer expressed the opinion that the plaintiff was unable to return to any sort of heavy manual labor and referred him to the Department of Social Services for some sort of financial assistance (Tr. 97). Later that same month, Dr. Strohmeyer advised the plaintiff to go back to vocational rehabilitation (Tr. 96). He encouraged the plaintiff to try to drive a truck, which he had done for 30 years, and indicated that "I think that he would be able to do that" (Tr. 96).

In March 2006, Dr. Stohmeyer completed a "Treating Physician's Statement" (Tr. 91-94). For the period of "December 2003 to present," Dr. Strohmeyer found that the plaintiff could perform sedentary work which allowed for alternating between sitting and standing. He found that the plaintiff had a significant limitation in his ability to concentrate, remain alert, think clearly or otherwise attend to work tasks to completion during an eight-hour workday due to pain or other discomfort. He found that the plaintiff's limitation in concentration and attention to tasks would be less than 20% of the workday or workweek. Dr. Strohmeyer stated that the plaintiff would miss work from two to three days per month

due to increased symptoms. Finally, he stated that the plaintiff could perform only part-time work due to pain, fatigue, and other subjective symptoms (Tr. 92-94).

The ALJ gave Dr. Strohmeyer's opinion "little weight," stating that the opinion was not supported by the doctor's own treatment notes in which he indicated that the plaintiff was able to work. The ALJ contended that Dr. Strohmeyer's opinion was not supported by objective medical evidence. The ALJ also noted that Dr. Strohmeyer recommended that the plaintiff attend vocational rehabilitation and told the plaintiff he would have a "tough time" receiving disability. He also encouraged the plaintiff to try truck driving. Further, in November 2005, Dr. Strohmeyer told the plaintiff that "not much has changed in two years" (Tr. 20).

The plaintiff argues that the ALJ's conclusion that Dr. Strohmeyer's comment about the plaintiff having difficulty in getting approved for Social Security disability was contradictory to his opinion that the plaintiff was limited to part-time sedentary work is unwarranted. This court agrees. Similarly, Dr. Strohmeyer's comment that the plaintiff should go back to vocational rehabilitation and try to drive a truck contains too little information about what he meant to directly contradict his later opinion. Further, Dr. Strohmeyer's opinion was supported by the opinion of Dr. Eline, who, like Dr. Strohmeyer, is a board-certified orthopaedic surgeon. Dr. Eline saw the plaintiff for a consultative examination at the request of the Commissioner and concluded that the plaintiff was unable to stand for greater than 10 minutes, sit for greater than 30 minutes, walk for greater than 10 to 15 minutes, and lift greater than five pounds. The ALJ gave Dr. Eline's opinion "little weight," noting that Dr. Eline examined the plaintiff only once. However, the ALJ gave "significant weight" (Tr. 21) to the opinion of Dr. Kukla, a nonexamining State agency physician whose medical credentials are unknown, who reviewed the medical evidence and found that the plaintiff could perform light work (Tr. 83-90). As argued by the plaintiff, the opinion of this medical consultant "is so threadbare that it cannot be considered substantial

contradictory evidence" (pl. brief. 11). Accordingly, upon remand, the ALJ should be directed to reevaluate the medical opinions in accordance with the above-cited law. Furthermore, to the extent the ALJ finds that Dr. Strohmeyer's findings are contradictory, she is directed to seek clarification from him.[3]

*Credibility*

The plaintiff next argues that the ALJ erred in finding that the plaintiff's allegations concerning the nature and severity of his impairments were not entirely credible. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

---

[3] The Social Security Disability regulations provide in pertinent part:
> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1).

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ determined that the plaintiff had medically determinable impairments that could reasonably be expected to produce his alleged symptoms, but that his statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible (Tr. 19). In support of this finding, the ALJ focused on the following:

(1) the plaintiff's daily activities, including watching television, meeting his five-year old son at the school bus, attending church, driving a car, and paying bills;

(2) gaps in the plaintiff's treatment;

(3) the plaintiff's limited use of prescription pain medication; and

(4) the plaintiff's ability to work for many years despite his foot injury.

(Tr. 19-20).

16

The record reveals gaps in the plaintiff's medical treatment between May 2003 and December 2003 (Tr. 67, 103), July 2004 to January 2005 (Tr. 98-100); and from November 2005 to March 2006 (Tr. 76, 95). Further, the plaintiff's medication consisted primarily of over-the-counter medications and Darvocet, which was taken on an as-needed basis (Tr. 20, 80). As noted by the ALJ, the plaintiff's activities "were not limited to the extent one would expect given the complaints of disabling symptoms and limitations" (Tr. 20). For example, the plaintiff watched television, walked to the mailbox, met his five-year old at the school bus, went to church some nights, had no problems with personal care, could drive and ride in a car, and paid bills (Tr. 57- 64). At the hearing, the plaintiff testified that he could drive, wash dishes, and go to church (Tr. 123-25). As argued by the defendant, while not alone determinative, the ALJ considered evidence of the plaintiff's daily activities with the evidence of record as a whole, which supported his conclusion. Based upon the foregoing, this court finds that the ALJ properly considered the plaintiff's credibility, and substantial evidence supports her finding.

*Vocational Expert Testimony*

The ALJ found that the plaintiff was "limited to unskilled work secondary to mild to moderate concentration deficits from pain" (Tr. 17). The ALJ ultimately concluded that the Medical-Vocational Guidelines ("the Grids") "directed" a finding of "not disabled" (Tr. 22). The plaintiff contends that the ALJ erred by relying on the Grids to deny the claim and failing to obtain expert vocational testimony when a significant nonexertional impairment was present. This court agrees.

In *Grant v. Schweiker*, 699 F.2d 189 (4th Cir.1983), the Fourth Circuit Court of Appeals held that where a claimant

> demonstrates the presence of nonexertional impairments, the Secretary, in order to prevail, must be required to prove by expert vocational testimony that, despite [the claimant's]

17

> combination of nonexertional and exertional impairments, specific jobs exist in the national economy which he can perform. The grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments.

*Id.* at 192. However, in *Smith v. Schweiker*, 719 F.2d 723, the Fourth Circuit found:

> [N]ot every malady of a "nonexertional" nature rises to the level of a 'nonexertional' impairment." The proper inquiry, under *Grant*, is whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. If the condition has that effect, it is properly viewed as a "nonexertional impairment," thereby precluding reliance on the grids to determine a claimant's disability.

*Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984).

The defendant argues that the plaintiff's "nonexertional limitation of being limited to unskilled work is incorporated into the [Grids]" (def. brief. 16). However, the plaintiff's nonexertional limitation is "mild to moderate concentration deficits from pain"; the ALJ made the determination that this nonexertional limitation limited the plaintiff to unskilled work. In *Chapa v. Astrue*, No. 2:05-CV-0253, 2008 WL 952947 (N.D. Tex. April 8, 2008), the court stated:

> The ALJ further found this nonexertional impairment limited plaintiff to unskilled jobs. In making this determination, the ALJ, in effect, became a vocational expert. Whether plaintiff's moderate impairment in the area of concentration, persistent and pace limited plaintiff to one and two step jobs and whether such eroded the occupational base and to what degree it was eroded was a determination for a vocational expert. While the ALJ may be correct that jobs calling for simple and/or one to two step instructions may be unskilled sedentary jobs, such jobs also require an individual to perform repetitive tasks over an eight-hour work day. Plaintiff's nonexertional impairment of moderate limitation in the area of concentration, persistence and pace, could directly affect plaintiff's ability to remain attentive and concentrate. This could directly affect plaintiff's ability to perform simple sedentary work, such as assembly line work, unskilled in nature, which the ALJ found plaintiff capable of performing. It may be that a vocational expert can identify

18

>unskilled sedentary jobs which would not be affected by plaintiff's nonexertional limitations. It may also be that a vocational expert would find limitations in the area of concentration, persistence and pace, would affect such jobs and further erode the number of unskilled sedentary jobs available. Reversal and remand is required so a vocational expert can be called and can address the issue.

*Id.* at *6. *See also Wilson-Johnson v. Chater*, 70 F.3d 1283, 1995 WL 694081, *5 (10th Cir. 1995) (finding that the ALJ committed reversible error by deciding the vocational issue on his own by concluding that the claimant would be limited to unskilled work due to deficits in concentration). Based upon the foregoing, upon remand, the ALJ should be instructed that if she reaches step five of the sequential analysis, she should obtain vocational expert testimony to establish whether the plaintiff can perform other work despite his exertional and nonexertional limitations.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

>s/William M. Catoe
>United States Magistrate Judge

June 26, 2008

Greenville, South Carolina